[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
On April 4, 1994, the City Council of the defendant City of Norwich ("Norwich") voted to acquire by eminent domain certain property of the plaintiff Timothy Wawrzynowicz ("owner") for the construction of a new fire department headquarters. The property so taken by Norwich, a municipal corporation, consisted of two parcels which abutted each other and were designated on the Norwich tax list as #8-14 Aqueduct Street and #15 Fairmont Street in Norwich.[1] Each of the parcels contained .21 of an acre, more or less. Norwich filed its Statement of Compensation on April 28, 1994 and it set out that, as condemnor, it had determined that the amount of compensation to be paid to the persons entitled thereto for the property taken was $22,900.00. It deposited that sum with the Clerk of the Superior Court in accordance with General Statutes § 8-130. See City of Norwich v. Timothy Wawrzynowicz, Docket #KND-CV94-010-53-53. On May 24, 1994, the Court (Teller, J.) granted the motion of Timothy Wawrzynowicz, as the owner, for the payment of the $22,900.00 deposit.
On May 11, 1994, Wawrzynowicz, as the owner of the condemned property, alleging that he was aggrieved, filed his appeal and application for review of the foregoing Statement of Compensation, pursuant to General Statutes § 8-132. Norwich denies that he is CT Page 401 aggrieved. The matter was referred to the undersigned state trial referee for all further proceedings including hearing, decision and judgment. Written appraisals were exchanged between the parties and a hearing was held at which evidence, including expert testimony, was taken. William Henry and James Blair testified as the real estate experts for the plaintiff and defendant respectively. Thereafter, this Court viewed the subject property with counsel.
Other background circumstances may be appropriately set out at this point. Timothy Wawrzynowicz has operated a used furniture, antiques and appliances business in the Taftville section of Norwich since July 1974. His Taftville location was "quite a ways" from the center of Norwich; it was "on the outskirts of town." In the interest of relocating his business to a better business location in June 1989 he purchased two abutting parcels of land in Norwich, one at #8-14 Aqueduct Street and the other at #15 Fairmont Street. He purchased this property "to relocate [his] business in the best area of town that [he] saw fit for [his] business because there's a lot of traffic." Henry also appraised the subject property when Wawrzynowicz bought it in 1989. As indicated, the property involved is located on Aqueduct and Fairmont Streets. Each of these two parcels lie generally southerly of West Main Street also known as Route #82 which is the main highway from Route #395 into downtown Norwich. West Main Street, for our purposes, runs in a generally easterly-westerly direction. Neither of the condemned parcels abuts any part of West Main Street. As one travels easterly on West Main Street toward downtown Norwich, one comes to its intersection, from the traveler's left, with West Thames Street formerly known as Forest Street. At least one hundred and fifty feet from the intersection of West Main Street and West Thames Street as one proceeds left on West Thames Street is the corner of Aqueduct Street and West Thames Street. Aqueduct Street forms a T-intersection with West Thames Street. Aqueduct Street is itself a dead-end street. If one turned left from West Thames Street into Aqueduct Street and went a short distance on Aqueduct Street he would come upon this owner's #8-14 Aqueduct Street parcel of .21 acres, more or less. Other land, not belonging to Wawrzynowicz, however, abuts his Aqueduct Street parcel. That other land is the corner of Aqueduct Street and West Main Street. At least a portion of the abutting land just referred to belonged to one Ziff when Wawrzynowicz purchased the subject property in 1989. Fairmont Street is the next street westerly and generally parallel with West Thames Street. Wawrzynowicz' other parcel known as #15 Fairmont Street has a severe downward slope CT Page 402 from Fairmont Street as it approaches his Aqueduct Street parcel. The characterization of the nature of this slope by the plaintiff's expert William Henry as "gradual" at one point in his testimony and "moderate" at another point is rejected. His written appraisal report is not quite the fact when it says "access from Fairmont Street would be rather difficult because the subject parcel drops off from the street level." Even more close to the fact is his trial testimony that the height of Fairmont Street, vis a vis the Wawrzynowicz property, made access from Fairmont Street "very difficult". Henry's cross-examination disclosed that there was a "wall", some eight feet in height, along Wawrzynowicz' Fairmont Street boundary, the top of which is about level with the street level of Fairmont Street itself. This, however, can hardly be considered the whole slope eastward and downward toward his Aqueduct Street parcel. This may be partially visualized from photographic exhibits but a view of the subject property confirms the severity of the slope. Wawrzynowicz himself admitted that one "absolutely" cannot drive into the subject property from Fairmont Street.
Wawrzynowicz does not and never did own any frontage on West Main Street. The entire frontage on West Main Street is and was at all relevant times owned by the State of Connecticut. Just how far back from West Main Street the State of Connecticut owns is not disclosed by any credible evidence. This is due to the lack in the evidence of any map survey, or site plan or even a sketch purported to be to scale. There was evidence from Wawrzynowicz that the State owned "a large strip all the way down to the end [and] they [the State] also owned a piece that comes up with a wall over to here like this." On this branch of the matter, however, one thing is clear and that is that Wawrzynowicz has never owned any frontage on West Main Street. Moreover, Wawrzynowicz' two parcels were not the only property condemned with reference to this new fire department headquarters. He testified that when he purchased the two parcels he "intended to buy a piece of property next door", the so-called Ziff property. At that time Ziff, he said, was already ninety years old and so Wawrzynowicz decided to "wait him out". In the meantime, however, the defendant City of Norwich took the Ziff property. Thereafter, Norwich took the Wawrzynowicz parcels. The State of Connecticut still owns the West Main Street frontage.
When he purchased the property in 1989 there were three multi-family structures on it. There was a five-family structure and two other structures, each with two-family units — a total of nine units. They were not fully occupied but had gas, water, sewer CT Page 403 and electricity. All three structures were in "dilapidated condition" and, as Wawrzynowicz testified, "they were just shacks." Shortly after he purchased, he got letters from the health and fire departments stating that the condition of the buildings made them uninhabitable for human use. After the tenants left he boarded them up. Thereafter, he demolished all three buildings in April 1992.
When Norwich condemned his property on April 18, 1994, it was all vacant land. All three buildings he demolished were in the MF-5 zone, i.e. Multiple Family Residential, as was the Ziff and State of Connecticut property. The zoning maps in evidence disclose that the property encompassed by West Main Street, West Thames Street, Aqueduct Street and Fairmont Street were zoned MF-5 at the date of taking. He was fully aware of the MF-5 zoning of the property he purchased when he acquired it.
Both parties have filed post-trial briefs. The owner Wawrzynowicz makes the following claims of law: (1) the opinion of Norwich's expert witness Blair is not supported by competent evidence; (2) on the date of the taking there existed "a strong probability" that Wawrzynowicz' land would be re-zoned to commercial; (3) on the taking date his property had a fair market value of $93,500.00 as commercial property; (4) on the taking date his property had a fair market value of $76,300.00 if it remained in an MF-5 zone; and (5) Wawrzynowicz is entitled to appraisal fees of $2,150.00.[2] The claims made by Norwich are (1) that the comparable sales approach to value used by Henry, the owner's expert, had "numerous flaws" and resulted in an "unrealistically high appraisal value" including, inter alia, his failure to make "any adjustments" in that approach; and (2) the owner has not demonstrated that there is a reasonable probability that the zoning of his property would be changed MF-5 (Multiple Family Residential) to commercial.
In an eminent domain matter, "It is the court's duty to award just compensation to an owner whose property is taken for public use. The usual measure of just compensation is the fair market value or the price that would probably result from fair negotiations between a willing seller and a willing buyer, taking into account all the factors, including the highest and best or most advantageous use, weighing and evaluating the circumstances, the evidence, the opinions expressed by the witnesses and considering the use to which the premises have been devoted and which may have enhanced its value. . . . Put in another way, the rule CT Page 404 is that the trier must take into consideration everything by which value is legitimately affected including those factors which a willing buyer and a willing seller would consider in fairly and advantageously negotiating an agreement. . . ." Wronowski v.Redevelopment Agency, 180 Conn. 579, 586 (1980).
"The function of the trial court in condemnation cases is to determine as nearly as possible the fair equivalent in money for the property taken." Alemany v[.] Commissioner of Transportation,215 Conn. 437, 444 (1990).
The referee is the final judge of the credibility of witnesses and the weight to be given their testimony. Morgan v. Hill,139 Conn. 157 (1952). In this process the "trier's acceptance and use of the testimony on some points does not preclude its rejection in others." Morgan v. Hill, supra 162; see Stanley Works v. NewBritain Redevelopment Agency, 155 Conn. 86, 99 (1967). The opinion of experts as to the value of land is not binding upon the Court.Birnbaum v. Ives, 163 Conn. 12, 20 (1972). The purpose of offering in evidence the opinions of experts is to aid the trier to arrive at his own conclusion which is to be reached by weighing those opinions in light of all the circumstances in evidence bearing upon value and his own general knowledge of the elements going to establish it . . . ultimately, the determination of . . . value . . . depend[s] on the considered judgment of the referee, taking into account the divergent opinions expressed by the witnesses and the claims advanced by the parties. . . ." Bennett v. New Haven RedevelopmentAgency, 148 Conn. 513, 516 (1961); see Greenfield Development Co.v. Wood, Commissioner, 172 Conn. 446, 458 (1977); see Gentile v.Ives, 159 Conn. 443, 451 (1970). The visual observations made by the trier in a visit to the property are just as much evidence as evidence presented for its consideration under oath. Birnbaum v.Ives, 163 Conn. 12, 20 (1972). "`In condemnation proceedings, the trial court is more than a trier of facts or an arbiter of differing opinions of witnesses; it is charged with the duty of making an independent determination of value and fair compensation in light of all the circumstances, the evidence, its general knowledge and its viewing of the premises.' D'Addario v.Commissioner of Transportation, supra, 366; EF Realty Co. v.Commissioner of Transportation, 173 Conn. 247, 253, 377 A.2d 302
(1977)." French v. Clinton, 215 Conn. 197, 201 (1990); SeeMinicucci v. Commissioner of Transportation, 211 Conn. 382, 388
(1989).
I.
CT Page 405
During the hearing before this Court various opinions of the fair market value of this owner's property were given, both from experts and from the owner himself. We take up first that of the owner Wawrzynowicz. An owner of real property has been held competent to testify as to its market value. Misico v. LaMaita,150 Conn. 680, 684 (1963), see 5 Nichols Eminent Domain (Rev.3d 1989) § 18.4(2). An owner, however, is qualified to express such an opinion only in a reasonable way. 5 Nichols, supra, §§ 7, 3[2] and cases there cited. One Court has said that: "The owner does not testify as just another expert, but from his unique position as the individual who stands to gain or lose the most from the tribunal's determination of the value of his property. The owner is draped with no cloak of expertise; the jury is aware of the owner's interests and free to evaluate his testimony, even to discard it altogether, in weighing the evidence. . . ." District of ColumbiaRedevelopment Land Agency v. Thirteen Parcels of Land in Squares859, 912, 934 and 4068 in the District of Columbia, 534 F.2d 337,340 (D.C. Cir. 1976). Nichols, a recognized commentator on eminent domain, has said: "Market value, it has been held, is not equivalent to the amount expended for the property by the owner." 4 Nichols, Eminent Domain (Rev.3d edition) § 12B.11[13 n. 7 and cases there cited.
Wawrzynowicz was of the opinion that his property, when taken by Norwich, had the value of $116,929.00. He explained that he arrived at this figure by totaling the following figures:
 Site cost at time of 1989 purchase $ 75,000.00 Interest paid on mortgage from 1989-1992 $ 20,199.25 City taxes paid from 1989-1992 $ 8,480.75 Appraisal at time of purchase in 1989 $ 500.00 Attorneys' fee for closing in 1989 $ 375.00 Cost of demolition in April 1992 $ 12,375.00 ---------- $116,930.00
He said that he bought this property to relocate his business in a much more desirable business location. In that regard he spoke of his intention to buy the Ziff property as well as to acquire that land that was owned by the State which bounded on West Main Street. He felt, he said, that under the circumstances of the area, particularly the proximity to West Main Street, that there was "a high probability that I could get the zoning changed" to commercial. He, however, made no real effort to buy the Ziff CT Page 406 property but decided to wait Ziff out. While he did get maps from the State, he did nothing more. He did not get any price from the State and he did not enter into any negotiations with them. Even his own expert witness, Henry, said that in his expert opinion the Wawrzynowicz property if zoned commercial would have a fair market value of $93,500.00, which was much lower than Wawrzynowicz' figure. This Court cannot accept, on the law and the credible evidence, Wawrzynowicz' opinion of value to which he testified.
 II.
We turn now to the claim of the plaintiff Wawrzynowicz that on the date of the taking "there existed a strong probability" that the Wawrzynowicz land would be re-zoned commercial and that, because of this probability, his property on that date had a fair market value of $93,500.00 according to his expert real estate witness Henry. We consider first whether this claimed probability has been proven by the owner. If it has not, then we do not reach the issue of its fair market value as commercial. Norwich, of course, claims that this probability has not been proven. Moreover, consistent with its claim that there existed no reasonable probability of a change of the subject property to commercial zoning, the defendant Norwich offered no evidence at the trial of the subject's dollar value as if it were zoned commercial.
"The general rule, as stated in numerous cases, is that evidence of the probability of a zoning change is admissible because it is a factor which would be considered by a buyer in the determination of market price." Transportation Plaza Associates v.Powers, 203 Conn. 364, 375 (1987). This comports with the rubric that "fair market value has been defined to mean that price which a willing seller and a willing buyer would agree upon following fair negotiations . . . [and] an appraisal of fair market value should take into consideration that use of the property that would provide a prudent investor the greatest financial return. . . ." Tandet v.Urban Redevelopment Commission, 179 Conn. 293, 299 (1979); seeBudney v. Ives, 136 Conn. 83. "The fair market value of realty is determined in light of the use to which it is being put at the time of the taking or to which it could be put most advantageously."Transportation Plaza Associates v. Powers, supra, 375-376. (Emphasis in original.) Fair market value "should ordinarily be based on the `highest and best' possible use of the land." Lynchv. West Hartford, 167 Conn. 67, 73 (1974). Stated somewhat more elaborately: "Where in the opinion of [an] appraiser the property is not, on the date of taking, being put to its highest and best CT Page 407 use, it is incumbent on the appraiser to provide the trier with sufficient evidence from which it could conclude that the land to be taken would, but for the taking, be devoted to the proposed use by a prudent investor in the near future." Tandet v. UrbanRedevelopment Commission, supra, 299. "The uses to be considered must be so reasonably probable as to have an effect on the presentmarket value of the land. Purely imaginative or speculative value should not be considered." Ibid. 299-300. (Emphasis in original.) The questions of which is the highest and best use of property and whether there is a reasonable probability of a change of zone are questions of fact for the trier. Green v. Burns, 22 Conn. 736, 748
(1992); Heath v. Commissioner of Transportation, 175 Conn. 384, 390
(1978).
At this point we note that the plaintiff Wawrzynowicz, particularly through his expert Henry, advanced two different scenarios as to fair market value. The first was posited on the claim that there was a reasonable probability of zoning change to commercial zoning, while the second developed that value if the zoning remained MF-5 (Multi-Family) as it was on the taking date.
The owner's expert Henry testified that there was a "very strong probability" of a zone change to a commercial zone. His written report went somewhat further where he opined the "strong potential" that the entire block in which this owner's property is situated "could be changed to Commercial Zone." (Emphasis in original.) He, therefore, was of the opinion here that the highest and best use for this owner's two parcels "is for a Commercial Use." Under this scenario of his appraisal, Henry's opinion of fair market value was $93,500.00.
It is true that West Main Street, a.k.a. Route 82, is the major east-west highway into downtown Norwich from I-395, several miles westerly of the subject property. It is also true that this property, while not on West Main Street, has fair accessibility to it and is itself not far from downtown Norwich. There is on the south side of West Main Street commercial establishments and uses along West Main Street which continue on that side as one proceeds westerly back toward I-395. According to the zoning map, however, this commercial zoning is along properties that front on West Main Street on that side and immediately behind this commercial zoning so far as the zoning maps disclose the great bulk of those properties are zoned either MF-5 (Multi-Family), MF-8 (Multi-Family), or Residence-10 in the area of the subject property. On the north side of West Main Street, in the block between Fairmont CT Page 408 Street and West Thames Street and where the State of Connecticut, as indicated earlier, owns the entire frontage on West Main Street, lies the Wawrzynowicz property. There are, of course, no structures or improvements on this State of Connecticut frontage. As indicated, this entire block framed generally by West Main Street, West Thames Street, Aqueduct Street and Fairmont Street, is entirely in the MF-5 (Multi-Family) zone. None of it abuts a commercial zone. For that matter, according to the zoning maps, the properties across Aqueduct Street northerly of the subject for some two or three blocks are zoned MF-5. In addition, the properties across Fairmont Street from the subject are zoned MF-5 for some two or three blocks northerly and westerly. There is on the corner of West Main Street and Fairmont Street a rather large wooden church structure which appears to be well maintained on the outside. Closely behind this church structure, which itself dominates that corner, the zoning along West Main Street as one proceeds westerly is commercial and is largely given to commercial and business uses. In a word, it is fair to say that West Main Street, according to the zoning maps, depicts commercial zoning on both sides of this highway in the area of the subject. West Main Street then, as disclosed by the zoning maps before the Court, is commercially zoned. On both sides of West Main Street its frontage is largely abutted in the rear of its commercial zoning on both sides of the street by multi-family and/or residence zoning in the area of the subject. It is not accurate, as Henry maintains, "that the subject property is surrounded by commercial properties that area zoned commercial." "Surrounded" is just not so. If anything, the West Main Street frontage vis a vis the subject is a commercial corridor largely abutted by residential uses to the rear in the area of the subject property.
It appears that the subject property is located somewhat outside the downtown district of Norwich and is close to the edge of the commercial development along West Main Street. There is no credible evidence to indicate that the multi-family and/or residence zoning in the area of the subject has been changed from that classification in recent years.
The subject property is not an island in the midst of land zoned commercial as the owner appears to argue. The credible evidence does not disclose that the circumstance of properties fronting on both sides of West Main Street of being devoted to commercial use has had any real effect on property northerly and westerly of the subject property which is all zoned MF-5 (Multi-Family) in the sense that the Multi-Family zoning bounding on CT Page 409 the West Main Street commercial zoning has really changed in the area of the subject property.
Henry and Blair were the real estate experts for Wawrzynowicz and Norwich. Blair, in contrast to Henry, opined that there was no reasonable probability of a zoning change to commercial. In their respective opinions on this phase of the case, it was evident that each expert had spoken to one Peter Davis, "a Norwich zoning official", and that Davis' claimed discussions with each was an important element in their respective opinions. This Court is aware that experts can, in giving their opinion, draw on sources not in themselves admissible, for example, on hearsay. See, generally, New Haven Savings Bank v. Valley Investors, 174 Conn. 77,82 (1977); Vigliotti v. Campano, 104 Conn. 414, 465-466 (1926). Nor has it been required that the administrative officials involved actually testify. See Transportation Plaza Associates v. Powers,supra, 377. Henry spoke to Davis about the property and the multi-family zone designation. He said that Davis told him that if the State did not own all the frontage on West Main Street in this block (as it did) that "the property from block to block . . . [then] there would be no question of a zone change [to commercial] . . ." but because that was not so "it would have to go before the planning and zoning commission." He further testified that Davis told him that the subject property could, however, be used for multi-family and apartments. Blair, on the other hand, said that he too had spoken to Davis, who had told him that he "indicated to Mr. Henry that as the property was zoned residential there was, you know, non-access from Route 82 [West Main Street]", that he thought that "the highest, the property would be allowed to be continued to use as multi-family, but not as commercial." Blair also said that Davis gave him "a letter of opinion" that anywhere between five and six units would be allowed at the site "at this time". It is problematic, in view of the different versions of what Davis' position actually was that Davis' "views" are not entitled to much weight as it plays into both Henry's and Blair's opinion. We say this realizing hearsay and other sources of information that real estate experts can and customarily use. This has been said to be so because "ordinarily evidence as to facts . . . given by an expert as to the basis of his opinion as to value comes with a sufficient guaranty of trustworthiness to justify the relaxation of the hearsay and best evidence rules." United States v. 5139.5 Acres ofLand, (4th Cir.), 200 F.2d 659, 662; See State ex rel State HighwayCommission v. Carlson, 463 S.W.2d 74, 78 (1970). Such evidence has also said to be justified of admission by the expectation that an expert in a condemnation will have made careful inquiry into the CT Page 410 facts upon which he bases his opinion. State ex rel State HighwayCommission v. Carlson, supra.
It is our view that insofar as Davis' views were part of Henry's opinion of probability of a zoning change, that those views weaken the credibility of Henry's overall opinion in this regard.
In applying the law to this issue, it is significant that, in determining the highest and best use of property, where such a change is to be found reasonably probable and not be a remote or speculative possibility, the change must be one that is reasonably probable in the reasonably near future. Budney v. Ives, 156 Conn. 83,88 (1968); Minicucci v. Commissioner of Transportation,211 Conn. 382, 385 (1989). There has been no such showing. The determination of the issue of the reasonable probability of a zoning change is made by the trier not only from the testimony and physical evidence, but also from its own personal observation of the property. Ibid. There is little doubt that the slope of the Fairmont Street parcel is "severe" and would present serious problems of site preparation for commercial or residential use. We also know that Wawrzynowicz had done practically nothing since his acquisition in 1989 in even trying to acquire the Ziff property before it was taken by the defendant City of Norwich. Moreover, he had done nothing but get some maps from the State as far as their land bounding West Main Street was concerned. Despite this, we do not overlook the circumstance that, prior to condemning the subject property, the defendant Norwich had condemned the Ziff property in its plan to acquire property for a new central fire headquarters. We also note the circumstance that it is the Norwich City Council which acts as the zoning authority in the granting or denying of such a zone change. Here, we recognize, as we must on this issue of reasonable probability, that "although the possibility of a change in zoning requirements always exists in some degree, it must often be difficult to prove that such a possibility has become a reasonable probability . . . Because of the uncertainties necessarily attending the determination of the probability of the happening of such an event in the future, claims and evidence regarding the probability must be scrutinized with care and examined with caution." Budney v. Ives, supra. The burden of proof of the existence of a reasonable probability of a zone change in the reasonably near future was upon the owner Wawrzynowicz. Levine v.Stamford, 174 Conn. 234, 235 (1978); Tandet v. Urban RedevelopmentCommission, supra, 299. We conclude that he has not sustained that burden of proof. CT Page 411
 III.
Having resolved the issue of reasonable probability of a zoning change to commercial against Wawrzynowicz, we now turn to his claim that his property had a fair market value on the date of taking of $76,300.00 if it remained in an MF-5 zone. Under this scenario Wawrzynowicz claims that if the highest and best use is found to be usage of the subject property in an MF-5 zone, then the fair market value on the taking date is $76,300.00 as his expert Henry opined. In doing so Wawrzynowicz refers to evidence developed through expert testimony, particularly Henry's, of those uses to which the subject could be improved. He argues that MF-5 zoning permits not only single family residences but also multi-family use. This zoning also allows garden type apartments or a high-rise. Wawrzynowicz contends that in any event under the present MF-5 zoning designation, the 18,000+ square footage of his property could, under present zoning, allow at least six units of garden type apartments or up to twelve units of high-rise. Therefore, he argues that his property had more value at the taking date than a similar property in "a residential zone." In addition, he also claims that under the zoning ordinance he could build two two-family dwellings (duplexes) on the 18,000+ square feet he owns if it is split into two lots.
Henry arrived at his opinion of $76,300.00 by using the comparable sales approach after deciding that the income and cost approaches were essentially not useful here. Blair, Norwich's expert, also confined his appraisal to the comparable sales approach. Under our view of the evidence and the applicable law we need spend very little analysis on Norwich's comparable sales approach set out by the expert Blair. This is so largely because we conclude Henry's analysis in his comparable sales approach is not persuasive in supporting his $76,300.00 opinion of value.
None of the twelve comparables used by Henry in his comparable sales approach were of vacant land but all consisted of properties improved by either two- or three-family houses. Henry indicated that there were no sales of unimproved land in Norwich in an MF-5 zone and Blair agreed. We have, accordingly, no problem with using improved properties in the approach to arrive at site values. In his "Comparable Site Value by the Allocation Approach" Henry values comparable multiple family zoned properties with improvements (dwellings) thereon. From the value of the land as improved by, for example, dwellings, he then allocates a value to the site (the land) itself. He said that he made adjustments when he decided he CT Page 412 should. His view is that the allocation approach is deemed the most reliable in valuing land in fully developed neighborhoods. He says that "Multiple Family zoned areas in Norwich are fully developed leaving very few vacant sites" and that "those sites which are vacant, may have sold over the past six years, but many of those sites need extensive site work which is not reflected in the sales price." He then says that, using sales over the past two years he analyzes them and employs them in his report instead of using old data. In doing so, he estimates, i.e. "allocates" land values "to be twenty five per cent of the total sales price with land and multiple family dwelling."
At this point we note parenthetically that of Henry's twelve comparables eight were in the MF-5 zone (and consisted of two- and three-family houses), two were in the MF-8 zone (consisting of two two-family houses), one was in R-10 residence zone and was a three-family house, and one was a two-family house in the GC general zone which is the same zone as the commercially zoned property along West Main Street (Route #82). Nevertheless, Henry applied the twenty-five per cent allocation factor for land site value across the board to each of these twelve properties. In his methodology here, Henry, after applying his twenty-five per cent allocation factor across the board, arrived at a dollar price per square foot for his land (site) value of each of his twelve comparables. He then determined that sale #9, his North Cliff Street comparable, was the "best indicator" of value and he utilized the adjusted site value of $4.17 per square foot on that property to arrive at his value opinion of $76,300.00 for the subject property, i.e. $4.17 X 18,295 square feet of subject = $76,290.00 rounded to $76,300.00. Parenthetically, Henry testified that his North Cliff Street comparable was in the "immediate area" of the subject and his report said that it was "approximately one mile" from the subject. Concerned as we are here with urban property as opposed to rural, we cannot enhance the location quality of North Cliff Street by calling it in the "immediate area" when it is "approximately one mile" from the subject. He did admit that the North Cliff Street property had been "upgraded" just before its most recent sale. The adjusted price per square foot of this comparable, Henry stated, is $4.17 and is located on a lot one-third the size of the subject property.
The defendant takes the position that Henry's comparable sales approach contains a number of flaws which result in his $73,500.00 opinion being "an unrealistically high appraisal value." These claimed flaws include, for example, the arbitrary twenty-five per CT Page 413 cent allocation rate to site value uniformly to all his comparables without any explanation, whereas Norwich claims Blair endeavored to compare the Wawrzynowicz property to vacant lots in Norwich in multi-family zoned areas to the extent possible. It also claims that Henry failed to consider the quality of the lots, the quality of the dwellings on those lots, the location of his comparables, and the size of the lots or zoning restrictions in reaching his conclusions as well as failing to make necessary adjustments.
At this juncture it is appropriate to refer to certain principles concerning the comparable sales approach to value. In a condemnation case the Utah Supreme Court fittingly stated, "On the question of the evaluation of property, as in most areas of the law, a resort to common sense and practical experience is helpful. Real estate has always been regarded as unique because no two parcels can be exactly alike. It is certainly not to be supposed that there will be found sales which are identical as to time, location, quantity and various characteristics of the property. The requirement is that it meet the test of `reasonable comparability'. That is that these factors exist in sufficient similarity that the same can fairly be regarded as having some probative value in arriving at a proper appraisal of the property."Redevelopment Agency of Salt Lake City v. Mitsui Inc., 522 P.2d 1370,1373 (1974; State Roads Commission v. Parker, 344 A.2d 109,119 (Md.App. 1975); see 5 Nicholas, Eminent Domain (Rev.3d Ed. §§ 21.3[1], 21.31[3]. While comparable sales is one of the most reliable methods of determining fair market value, see e.g. UnitedStates v. 21,500.00 Acres of Land, 436 F.2d 498, 502 n. 2 (10th Cir. 1988); L'Eloile v. Director of Public Works, 89 R.I. 394,153 A.2d 177 (1989); State ex rel Highway Commission v. Jasper,544 S.W.2d 554 (1976), its most appropriate utility must consider all significant factors affecting comparability which includes among others: location and character of the property, proximity in time and location, the use to which property is put, size, adaptability, zoning, topography, size and available utilities. Nichols, op.cit., 1 Orgel, Valuation under Eminent Domain (2d ed) §§ 136-139, 85 A.L.R.2d 110 ("Admissibility on issue of value of real property of evidence of sale price of other property); 29 A.C.J.S. Eminent Domain § 283; Campbell v. New Haven, 101 Conn. 173 (1924). The more comparable the comparables advanced are, then the more probative they are of the fair market value of the subject. United States v.320.0 Acres of Land, 605 F.2d 762, 798 (5th Cir. 1979). It is for the fact finder to determine whether the claimed comparables are in fact comparable, and if so found to be, then to determine the weight to be accorded. United States v. 84.4 Acres of Land, CT Page 414348 F.2d 117, 119 (3d Cir. 1965); see E F Realty Company, Trustee v.Commissioner of Transportation, 173 Conn. 247 (1977).
Where the comparison sales approach to value is used, the appraisal report, to be useful to the trier of fact, should set out sufficiently any adjustments made to each of the comparable sales. See Snowbank Enterprises Inc. v. United States, 6 Ct. Claims 476, 492 (1984); Wright v. State of New York, 304 N.Y.S.2d 617, 618-619 (1969); Chase Manhattan Bank N.A. v. State of New York,479 N.Y.S.2d 983, 991 (1984). Ideally, any adjustment, however expressed (such as in percentages or dollars) made for each element of comparison involved should reflect, as reasonably as possible, the difference between each comparable advanced and the subject property. This takes into consideration that fair market value in eminent domain requires consideration of something by which value may be legitimately affected. Tandet v. Urban RedevelopmentCommission, 179 Conn. 293, 299 (1979).
In our analysis here we keep in mind that Wawrzynowicz' scenario is directed to the present use of the subject property in the MF-5 zone (Multi-Family zone). Insofar as Henry's making any adjustments to the twelve comparables advanced in his written report, that discloses that he adjusted only two of his twelve comparables and both for location and nothing more. He adjusted sale #1 on Rockwell Street downward 20% for its superior location to the subject. He adjusted sale #9 (North Cliff Street) which he called "the best indicator of value for the subject property" upward by fifteen cents per square foot for the subject's better location. The credible evidence discloses no further adjustments for any of his comparables. According to Henry's methodology upward adjustments apply to characteristics (of comparison) considered to be inferior to the subject property whereas downward adjustments apply to characteristics considered to be superior to the subject property. He made, he said, no adjustments for those characteristics considered to be equal in value. Two things may be noted concerning the two locations adjustments he so quantified. The fifteen cent upward adjustment for North Cliff Street converts to about a 3.5% upward adjustment under his analysis. That is a fairly precise number which was not explicated nor was the fifteen cents. It is hardly a "round number" such as one might fairly consider the 20% downward adjustment on sale #1.
Differences in location are an important element in passing upon the in-fact comparability of properties to the subject property. See, e.g., Morton Grove Park District v. AmericanCT Page 415National Bank, 350 N.E.2d 149, 188 (Ill.App. 1976); Pandolphi'sAuto Parts, Inc. v. Manchester, 181 Conn. 217, 224 (1980). Sale #9 (Henry's "best indicator" of value) was a three-family house in an MF-5 zone and was "approximately one mile" from the subject. His other MF-5 comparables included four two-family houses and two two-family houses which, according to him, were located at distances from the subject of approximately one mile to two and a half miles and no adjustment for location was made for any one of these. This means, according to him, that, as to this element, all those required no adjustment on this element. In this regard, even though Henry admitted on cross-examination that his comparable #8 (Huntington Place) was in a "better" location than the subject, he nevertheless made no adjustment for location. This is so even though he made a fifteen cent per square foot adjustment on his North Cliff Street comparable. The location characteristic of his other comparables include four dwelling houses, two in the MF-5 zone, one in General Commercial and one in R-10 (Residential). These were located approximately one mile, approximately one and a half miles, approximately one mile and approximately one-half mile, respectively, from the subject. This Court extends, under the circumstances, little credit to the claim that no adjustment for location was needed to be made to any one of ten comparables even quite apart from the rather precise adjustment of about 3.5% given to sale #9, the North Cliff Street property. In this regard we note the defendant Norwich's argument that "substantial" downward adjustments should have been made as to location because Henry used as comparables properties "located all around the large geographical area comprising Norwich." Although this Court was not given a map of Norwich, a mere recital of the distances from the subject lends credence to that claim. Moreover, the Court with counsel viewed not only the subject property also but the immediate vicinity and observed many multi-family houses, particularly northerly and westerly of the subject which on that position of the zoning map that is in evidence is zoned MF-5, and yet the nearest comparable to the subject is approximately one-half mile from the subject.
Going on, the date of claimed comparable sales vis a vis the date of the taking of the subject property is an element to be considered on the issue of comparability. "Whether a transaction is sufficiently close in point of time to afford a fair comparison is a matter resting largely in the discretion of the trier."Schnier v. Ives, 162 Conn. 171, 179 (1972). We have no problem with the proffered comparables as to this characteristic of comparability as all of them, except sale #1 of Rockwell Street, CT Page 416 took place in less than two years of the taking date of the subject. Rockwell Street was sold very shortly after the taking date of the subject; we do not believe this bars its being given consideration but is to be considered with all the other characteristics of comparability. We do point out that Henry's adjusted site value of Rockwell Street is $4.80 per square foot (the second highest of the twelve comparables, it is one of the smallest in lot size — being only about 26% of the size of the subject) and is a two-family house situated in an MF-8 zone approximately one and a half miles from the subject.
Another characteristic on the matter of comparability may be referred to as the physical characteristic which includes such matters as size, topography, age, shape and the like. "In ascertaining the market value of real property, any evidence which tends to show the physical condition of the property, the purpose for which it is employed, or any reasonable use for which it may be adapted, is competent" is permitted and helpful. People v.LaMacchia, 264 P.2d 15, 24 (Cal. 1953). or as one Court has said, "While it is true that in some circumstances certain conditions of the property are not necessarily material to the particular issues in the case . . . and need not be accurately portrayed, in a condemnation case the condition of the property is particularly material to its valuation." State Toll Highway Authority v. GrandMandarin Restaurant Inc., 544 N.E.2d 1145, 1148 (Ill.App. 1989). Insofar as the size of the comparables, we do have in Henry's evidence the square footage of each of the comparables which he has extrapolated apparently from their acreage. Every one of the twelve comparables are not only smaller in lot size than the subject but in every case except perhaps one (sale #3 which is .23 acres), less than one-half the size of the subject. No adjustment for the difference in size is made by Henry in any of his comparables. As already noted, insofar as the age of any of the buildings on these properties used as comparables, no evidence was adduced. Norwich claimed at trial that Henry used older buildings as comparables. Henry conceded that his comparables were "all old structures". Yet not a single adjustment was made for that.
The topography of the Wawrzynowicz property with its severe slope running downward from Fairmont Street we have already referred to. There is no evidence as to the Henry comparables that make us aware of any of the topography of any of the comparables, keeping in mind not only that some of them are as far away as one and a half to two and a half miles from the subject, but also that the approximate 3.5 upward adjustment for location of sale #9 on CT Page 417 North Cliff Street is honing rather precisely by way of making an adjustment figure.
Another characteristic of comparability is that of zoning. That is important as it essentially defines the bounds of the legal use of the real property involved. It is fair to say that sites zoned the same as the subject make for the most acceptable comparables. Eight of Henry's comparables are located in the MF-5 zone as is the subject. Two are in MF-8 which appears essentially to be very similar to MF-5 zoning. The remaining two include one in General Commercial and one in Residential 10. There was conflicting evidence as to exactly what multi-family units, particularly the number, could be built on the Wawrzynowicz property. Especially was this so because of the inconsistent attribution by Henry and Blair to the claimed position of Peter Davis. Henry's report states that Wawrzynowicz "should be considered the opportunity of building a new structure of ten residential units to replace [the] demolished units" which were built prior to zoning. He points out, however, that "to build ten apartment units a variances [sic] for minimum density per unit would be required." His report goes on to say that "The variances should not meet with much opposition as the site was grandfathered for use of ten apartment units." This "grandfathered" claim was not developed at all at the trial. Even assuming, without deciding, that this reference is meant to refer to the non-conforming use doctrine, Norwich's post-trial brief claims that any non-conformity uses were abandoned by Wawrzynowicz with this demolition of the structures on the subject property in 1992 as well as claiming additional zoning restrictions on rebuilding do exist. Just what the zoning authority in Norwich would do on the "variances" Henry refers to has not been shown with any reasonable probability. This matter is further complicated by conflicting information attributed to Peter Davis by Henry and by Davis. In addition, as set out earlier, there is no survey or plot plans of the subject in evidence to assist the Court. On all the evidence this Court cannot conclude that Wawrzynowicz has sustained his burden of proof that he can build on his property, under present MF-5 zoning, exactly the same number of units that pre-existed the demolition by him of the old buildings on the subject property some time before the April 1994 taking. We do, however, believe that the Wawrzynowicz property could be improved by multi-family and/or high rise housing.
In the broader picture Henry admitted that every one of his comparables were "all old structures" and yet we have referred to CT Page 418 the few adjustments that he made. When pressed on cross-examination as to why he did not make any more he said that was not necessary as well as the telling observation that he "assumed" that those adjustments necessary in his comparables were in the sales prices of the comparables. This, we submit, is a conclusory opinion for which no acceptable basis or analysis was given by him. In this case analysis as to his comparables vis a vis the subject property was called for particularly because the subject property was vacant, and hence unimproved property whereas the comparables he used to arrive at a value of the subject were all improved properties. While this approach was appropriate, the methodology was not. The New York Court of Appeals has aptly stated: "Sales of other parcels, where used as criteria in the evaluation of the subject property, need to be adjusted to differences between one another and between each of them and the subject property. An expert witness is able to make these adjustments out of his own experience, and, after allowing for such differences, can find them helpful in arriving at the particular value which he places upon the subject property, which is frequently different from the value of the other sales parcels." Latham Holding Co. Inc. v. State ofNew York, 16 N.Y.2d 41, 45 (1965); see Niagara Falls Urban RenewalAgency v. 123 Falls Realty Inc., 411 N.Y.S.2d 752, 754 (1978). This lack of adjustments which we have discussed seriously undermines the probative weight to be accorded Henry's analysis of fair market value of the subject in his comparable sales approach.
In addition, we now turn to Henry's comparable site value by the allocation approach which he said "is deemed the most reliable in valuing land in fully developed neighborhoods." Positing the almost complete absence of vacant sites in Norwich he turned to use two- and three-family dwellings in this approach. The explanation by Henry of the allocation approach was very sparse. It did appear that this method is used where vacant parcels of land in heavily developed urban locations are so few (even if existent) that the vacant site values cannot be estimated by direct comparison. Fairly viewed, that was the situation here and, therefore, the site value, i.e. the land value, is estimated by allocation. Choosing what an appraiser deems comparable improved properties, the appraiser, after analysis involving all his comparables vis a vis the subject property, arrives at what he estimates to be that portion of the value of the fair market value of the comparable improved properties, i.e. the land plus the improvements thereon, that is to be attributed to the site itself as the land value. This approach by allocation still does not eliminate or lessen the need to make adjustments where appropriate and Henry said that he CT Page 419 recognized this. After all, his comparables included, inter alia, two-family and three-family houses on lots of varying sizes in different locations in Norwich. We will not repeat here all we have already set out about Henry's handling of the adjustment aspect. He does apply a twenty-five per cent allocation factor across the board to all his comparables as the site value. It is submitted that no opinion of value can be better than the informational data upon which that opinion is based as well as the judgment and experience of the appraisal expert rendering that opinion. We have set out why we believe that Henry's analysis, particularly the lack of adjustments on his offered comparables, attenuates his opinion that the subject has a fair market value of $76,300.00. This attenuation is increased when he applies, without credible analysis, a straight twenty-five per cent factor to that already attenuated predicate of his comparables. We have been given no yardstick or guideline as to why a twenty-five per cent allocation factor is reasonable in this case, applied as it is to twelve variegated properties. It is understood that it is a judgment call on the part of the expert who, when asked, said there was no literature he could refer to to buttress his use of the allocation factor. The twenty-five per cent allocation factor might be reliable, it might then be reasonable, but that has not been proven.
Earlier we referred to the concept of the highest and best use. Henry's opinion was that the highest and best use of the subject property was for a commercial use. Wawrzynowicz' post-trial brief and Henry's evidence do claim that while the commercial use would be a more profitable use, its use for apartment units was also to be considered as they elaborate. On the other hand, Norwich's appraisal expert states that "the highest and best use for this site is for acquisition by an abutting property owner for expansion of their already existing site for offstreet parking or recreation."
This Court does not at all agree with Norwich's position here as to highest and best use. Returning to Wawrzynowicz' position on this issue, we have already resolved his claim of the reasonable probability of a zoning change to commercial and, therefore, his claim of commercial use of his property fails. We then return to his position of his property as permitted in the MF-5 zone. It is concluded that, under all the circumstances, the highest and best use of the subject property is its use under MF-5 zoning.
After viewing the property and after having given due CT Page 420 consideration to the testimony of all the witnesses and to all the evidence, and to my own knowledge of the elements establishing fair market value and to the applicable law, I conclude that the damages sustained by the plaintiff Timothy Wawrzynowicz by the taking of April 4, 1994 are FORTY ONE THOUSAND ($41,000.00) DOLLARS. Judgment may enter for the plaintiff Timothy Wawrzynowicz to recover of the defendant city of Norwich the sum of EIGHTEEN THOUSAND ONE HUNDRED ($18,100.00) DOLLARS in addition to the TWENTY TWO THOUSAND NINE HUNDRED ($22,900.00) DOLLARS already paid out to the plaintiff, with interest on said further sum of EIGHTEEN THOUSAND ONE HUNDRED ($18,100.00) DOLLARS at the rate of 10% per annum from the date of taking aid the date of payment. In addition, the plaintiff is awarded TWO THOUSAND TWO HUNDRED FIFTY ($2,250.00) DOLLARS for his appraiser's fee. With respect to the included interest see Leverty Hurley Co. v. Commissioner ofTransportation, 192 Conn. 377, 380-381 (1984).
Arthur H. Healey State Trial Referee